1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11
BOARD OF TRUSTEES OF IBEW
LOCAL UNION NO. 100 PENSION
TRUST FUND, et al.,

12

13
Plaintiffs,

14
v.

15

16
POWER DESIGN ELECTRIC, INC.,

Defendant.

17

18

CASE NO. 1:17-CV-01483-EPG

**ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT,
DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, AND DENYING
DEFENDANT'S MOTIONS TO STRIKE**

**(ECF Nos. 33, 34, 40, 42 )**

19      This action is brought under the Employee Retirement Income Security Act of 1974

20 ("ERISA") and the Labor Management Relations Act ("LMRA") against Defendant, Power

21 Design Electric, Inc. ("PDE"), by Plaintiffs, Board of Trustees of IBEW Local Union No. 100

22 Pension Trust Fund, Joint Electrical Industry Training Fund, National Electric Benefit Funds, and

23 Family Medical Care Plan (collectively, the "Trusts").[1] (ECF No. 2.) The Trusts allege PDE

24 breached two different collective bargaining agreements by failing to submit fringe benefit

25 contribution reports and remit fringe benefit contributions. The Trusts also seek an audit or

26 accounting of the records of PDE regarding the time worked by, and the contributions remitted or

27 ───────────────

28      [1] All parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (ECF Nos. 7, 22.)

1  not remitted for, PDE employees performing work covered by the collective bargaining

2  agreements. (*Id.*)

3      The Court has before it the parties' cross-motions for summary judgment (ECF Nos. 33,

4  34), PDE's motion to strike the Trusts' reply in support of their motion for summary judgment

5  (ECF No. 40), and PDE's motion to strike the Trusts' reply regarding objections to PDE's motion

6  to strike (ECF No. 42). The Court grants the Trusts' motion for summary judgment (ECF No. 34)

7  and denies PDE's motion for summary judgment (ECF No. 33). As to the motions to strike, the

8  Court denies PDE's motion to strike the Trusts' reply in support of its motion for summary

9  judgment (ECF No. 40), and denies as moot PDE's motion to strike the Trusts' reply regarding

10  objections to PDE's motion to strike (ECF No. 42).

11  I.    **BACKGROUND**

12      **A.  PDGP and PDE are formed by John Glover and Robert Glover**

13      In 2001, John Glover and Robert Glover, father and son, formed the Power Design

14  Electric General Partnership ("PDGP") to provide electrical contracting services. (ECF No. 33-2

15  at 2.) John and Robert were both general partners of PDGP. (ECF No. 33-2 at 2.) PDGP remained

16  active and continued to provide electrical contracting services until the inactivation of its

17  California electrical contractor's license in 2006. (ECF No. 33-2 at 2.) From April 2001 until

18  April 23, 2004, PDGP operated as a non-union shop. (ECF No. 33-2 at 2.) As discussed below,

19  on April 23, 2004, PDGP entered § 8(f) pre-hire agreements, converting it into a union shop. In

20  October 2006, PDGP inactivated its California contractor's license and, after that date, PDGP

21  provided no further electrical contracting services and ceased to operate as a going concern. (ECF

22  No. 33-4 at 2.)

23      Meanwhile, on October 30, 2003, Power Design Electric Incorporated ("PDE") was

24  incorporated. (ECF No. 33-4 at 4.) PDE was formed by the general partners of PDGP, John

25  Glover and Robert Glover, for the purpose of providing electrical contracting services. (*Id.*) John

26  and Robert were the only shareholders in PDE, with John having 51% of the shares and Robert

27  having 49% of the shares. (*Id.*) John served as the responsible managing officer ("RMO") of

28

PDE, and continued in that position for the next approximately eleven years.[2] PDE obtained its California electrical contractor's license on December 14, 2004, and that license remains in effect today, with an expiration date of December 31, 2020. (ECF No. 33-4 at 4.)

**B.  PDGP Executes Letters of Assent (§ 8(f) Pre-Hire Agreements), then Executes Agreement for Voluntary Recognition, Converting § 8(f) Pre-Hire Agreements into § 9(a) CBAs**

On April 23, 2004, after PDE had been formed but before it had obtained its California electrical contractor's license, PDGP entered into two separate "Letters of Assent-A." These Letters of Assent-A were executed by John, in his capacity as a general partner of PDGP, and in the presence of Robert. (ECF No. 33-4 at 12, 13.) The First Letter of Assent-A ("First Letter") authorizes the East Central Chapter-NECA ("NECA") to act as the collective bargaining unit for PDGP "for all matters contained in or pertaining to the current and subsequent approved Residential Construction agreement between the NECA and Local Union 100, IBEW." (ECF No. 33-4 at 13.) The Second Letter of Assent-A ("Second Letter") authorizes the NECA to act as the collective bargaining unit for PDGP "for all matters contained in or pertaining to the current and subsequent approved Inside Wireman's agreement between the NECA and Local Union 100, IBEW." (ECF No. 33-4 at 12.) Both Letters of Assent also provide that this "authorization, in compliance with the current approved labor agreement," is to "remain in effect until terminated by the undersigned employer giving written notice to the [NECA] and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary of the applicable approved labor agreement." (ECF No. 33-4 at 12, 13.) Finally, in both Letters of Assent, the employer agrees that "if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites." (*Ibid.*) The Letters of Assent constitute § 8(f) pre-hire agreements, as discussed below.

In December 2004, a majority of PGDP's then current bargaining employees authorized

[2] Robert took over as RMO on December 5, 2014. Robert also is now the sole shareholder of PDE, holding 100% of the shares. (ECF No. 33-4 at 4.)

Local Union No. 100 IBEW ("IBEW") to act as their collective bargaining representative, and on December 15, 2004, PDGP and IBEW entered into an "Agreement for Voluntary Recognition," in which IBEW was designated as the employees' collective bargaining representative under Section 9(a) of the NLRA. (ECF No. 33-4 at 15.) The Agreement for Voluntary Recognition provides that, "[b]ased on the showing of majority support, the Employer agrees to recognize the Union . . . as the NLRA Section 9(a) exclusive bargaining representative of all of its employees on all present and future jobsites within the jurisdiction of the Union." (*Id.*)

At the time the Agreement for Voluntary Recognition was executed, PDGP was bound by two collective bargaining agreements ("CBAs")—the Inside Wireman's Agreement and the Residential Construction Agreement. (ECF No. 33-2 at 4; ECF No. 33-4 at 29-71 (Inside Wireman's Agreement); ECF No. 33-4 at 73-101 (Residential Construction Agreement).) These CBAs require the employer to submit contribution reports to IBEW and remit contributions to the Trusts on a monthly basis. (ECF No. 34-1 at 17-18.)

As discussed below, the recognition of IBEW as the collective bargaining representative by a majority of PDGP's collective bargaining unit employees converted the CBAs from § 8(f) pre-hire agreements into § 9(a) CBAs as of December 2004.

**C. PDE Obtains its California Contractors License and Begins Performing Obligations Owed under the CBAs**

PDE obtained its California electrical contractor's license on December 14, 2004, the day before the Agreement for Voluntary Recognition was entered into by PDGP. (ECF No. 33-2 at 4-5.) Shortly thereafter, on March 16, 2005, and even though PDE was not a signatory to the Letters of Assent or the Agreement for Voluntary Recognition/§ 9(a) CBAs, PDE began to fulfill the obligations owed by the employer under the CBAs by remitting required contributions to the Trusts and submitting "Monthly Payroll Report[s] – Employee Listing" to IBEW. (ECF No. 33-2 at 5; ECF No. 33-4 at 4.) IBEW also began to dispatch union members to PDE, which PDE employed, pursuant to the terms of the CBAs. (*See* ECF No. 33-4 at 4-6.) As noted previously, in October 2006, PDGP inactivated its California contractor's license and, after that date, PDGP provided no further electrical contracting services and ceased to operate as a going concern. (ECF

No. 33-4 at 2.)

### D. **PDE Sends IBEW a Termination Notice and Stops Performing CBA Obligations**

On June 1, 2016, more than eleven years after PDE began performing the obligations owed by the employer under the CBAs, PDE sent a letter (the "Termination Notice") to both IBEW and NECA stating that "effective immediately" PDE was "terminating the agreements between the IBEW and Power Design Electric." (ECF No. 33-4 at 20.) The Termination Notice was executed by Robert Glover as President of PDE. (*Id.*)

At the time of the Termination Notice, the operative Inside Wireman's Agreement had effective dates of June 1, 2015, through May 31, 2018 (*see* ECF No. 33-4 at 33; ECF No. 34-1 at 12, 14); and the operative Residential Construction Agreement had effective dates of July 1, 2007, through June 30, 2010, with an evergreen provision that automatically renewed it from year to year unless changed or terminated, such that the agreement had been renewed through June 30, 2016[3] (*see* ECF No. 33-4 at 33, 79, 103; ECF No. 34-1 at 13, 14). Both the operative Inside Wireman's Agreement and the operative Residential Construction Agreement provide that either party "desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter." (ECF No. 33-4 at 33, 79.)

On June 6, 2016, Robert received a letter from legal counsel for IBEW. This letter stated that the Termination Notice was not effective to terminate PDE's obligations and that PDE remained bound by the CBAs. (ECF No. 33-2 at 8; ECF No. 34-1 at 7.) PDE, through Robert, responded with an additional letter to IBEW stating: "Please continue to consider the agreements between [PDE] and IBEW Local 100 to be terminated as previously stated in the letter written by me dated June 1, 2016." (ECF No. 33-2 at 8.) This letter also stated: "I have given written notice at least 90 days prior to the expiration of such agreement. As directed by the letter of assent – I have given written notice 'at least 150 days prior to the then current anniversary date of the applicable approved labor agreement.' Therefore there is no reason for the IBEW or NECA to

---

[3] Although the Residential Construction Agreement was set to expire on June 30, 2016, as discussed below, it was automatically extended for one additional year for an expiration date of June 30, 2017. (*See* ECF No. 33-4 at 33, 79, 103.)

continue to hold my company hostage or oppress my company or my efforts to feed, house, and/or otherwise improve my family." (ECF No. 33-2 at 8.)

PDE was designated for a fringe benefit compliance audit for the period of January 1, 2015, through the date of inspection, which was designated as August 31, 2017.[4] (ECF No. 34-1 at 8; 34-6 at 3.) In response to the compliance audit, PDE provided IBEW with some records but stated it was unable to provide IBEW with other requested records. (ECF No. 34-1 at 8; ECF No. 34-6 at 3.) PDE has not submitted any contribution reports, nor remitted any contributions, for the months of July 2016 through May 2018. (ECF No. 34-1 at 18.)

### E. The Trusts File this Action

On November 2, 2017, the Trusts filed this action against PDE for breach of contract and for an audit or accounting. The Trusts allege that PDE breached the CBAs by failing to submit fringe benefit contribution reports and remit any fringe benefits that are due, and by refusing to submit a complete accounting of PDE's records. The Trusts seek (1) submission of the delinquent reports by PDE and related third parties; (2) an audit or accounting to ascertain whether any further amounts are owed for the delinquency and other time periods; and (3) to the extent further amounts are owed, submission of these further amounts. (ECF No. 2 at 1-2.) The Trusts also seek interest on unpaid amounts owed, and recovery of costs and attorneys' fees.

On January 18, 2019, the parties filed cross motions for summary judgment. The Court held oral argument on the motions on February 22, 2019. The parties subsequently requested referral to the Court's Voluntary Dispute Resolution Program ("VDRP"). The VDRP process did not result in settlement of the case. (ECF No. 46.) Accordingly, the Court now rules on the parties' cross motions for summary judgment as well as PDE's motions to strike.

## II. PDE's MOTIONS TO STRIKE

### A. PDE's Motion to Strike the Trusts' Reply Regarding Objections to PDE's Motion for Summary Judgment (ECF No. 42)

PDE moves to strike the Trusts' reply regarding objections to PDE's motion for summary

---

[4] It is not clear from the evidence provided by the parties whether the Termination Notice was issued before or after PDE was designated for a compliance audit.

judgment. (ECF No. 40 (the Trusts' reply regarding objections); ECF No. 41 (PDE's motion to strike).) Because, as discussed below, the Court is denying PDE's motion for summary judgment, the Court declines to address the Trusts' objections to that motion. Accordingly, PDE's motion to strike the Trusts' reply filed in support of the objections is denied as moot.

**B. PDE's Motion to Strike the Trusts' Reply in Support of the Trusts' Motion for Summary Judgment (ECF No. 40)**

PDE moves for an order striking all or a portion of the Trusts' reply in support of summary judgment because the reply exceeds the length limitations imposed by the Court's Standard Procedures.[5] (ECF No. 39 (the Trusts' reply); ECF No. 40 (PDE's motion to strike).)

The Court's Standard Procedures provide that unless prior leave of Court is obtained, "[r]eply briefs by the moving party shall not exceed ten (10) pages." Section 1.d. of Standard Procedures for U.S. Magistrate Judge Erica P. Grosjean. Here, the Trusts filed a reply brief that is nineteen pages long and did not seek leave of the Court prior to doing so. The Trusts have thus violated the Standard Procedures.

In response to PDE's motion to strike, the Trusts explain that they were unaware of the page limits imposed under the Standard Procedures and that the filing of the overlength reply was inadvertent and nonwillful. (ECF No. 43.) The Trusts further explain that in their reply brief, they essentially reiterate the contents of their opposition to PDE's motion for summary judgment and that they provided this reiteration in their reply brief as a convenience to the Court. Finally, the Trusts explain that they included "signposts" in the reply brief that inform the Court where arguments had previously been made in their opposition to PDE's motion for summary judgment and that this was done in an attempt to reduce the burden on the Court. (*Id.*)

The Court expects all parties appearing before it to both be familiar with and comply with all Court rules and procedures, and a party's lack of familiarity does not justify a violation of

---

[5] PDE also contends that the Trusts violated court rules governing pleadings when the Trusts "improperly requested affirmative relief for the first time in their Opposition Brief." (ECF No. 40 at 4 n.1.) However, as the Trusts point out, they first asked for affirmative relief in their motion for summary judgment. (*See* ECF No. 34-2 at 14-17; ECF No. 43 at 2 n.1.) Although the Trusts ask for additional affirmative relief in their opposition to PDE's motion for summary judgment, that additional relief relates to PDE's assertion of the one-employee-unit rule, which was raised by PDE for the first time in its motion for summary judgment. The Court does not find, under these circumstances, that the Trusts violated court rules governing pleadings.

those rules and procedures. The Court does not, however, find that striking or partially striking the Trusts' overlength reply brief is warranted here and therefore denies the motion to strike. The Court cautions the parties that while it is being flexible about this violation, future violations of Court procedures or rules will be met with less tolerance.

## III.     MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 33, 34)

### A.     <u>Summary Judgment Standard</u>

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the court must determine "whether a fair-minded jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are

not enough to rebut a summary judgment motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist*., 237 F.3d 1026, 1031 (9th Cir. 2001).

In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n.2. But, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (citation omitted).

**B. Summary of Parties' Arguments**

***1. PDE's Motion for Summary Judgment***

PDE argues that it is entitled to summary judgment because it lawfully terminated the collective bargaining agreements. PDE is not contending that the terms of the CBAs themselves allowed PDE to terminate; instead, PDE contends that it simply is not bound by the terms of the CBAs. First, PDE argues that it had only one permanent employee from April 2014 until June 2016 and that, under the "one-employee-unit rule," PDE was able to lawfully repudiate the CBAs effective immediately upon IBEW and NECA's receipt of the Termination Notice.

Second, PDE argues alternatively that, as the alter ego successor to PDGP, it could lawfully terminate its agreements with IBEW and NECA effective immediately upon IBEW and NECA's receipt of the Termination Notice.

Third, PDE argues that, assuming that the CBAs were not terminated immediately upon IBEW's receipt of the Termination Notice, the Termination Notice was sent more than 150 days in advance of the Inside Wireman's Agreement's then-current anniversary date of May 31, 2018,

and more than 150 days in advance of the Residential Construction Agreement's then current anniversary date of June 30, 2017, and thus terminated the CBAs on their respective anniversary dates.

The Trusts argue that PDE cannot successfully invoke the one-employee-unit rule because PDE did not employ employees pursuant to a § 8(f) pre-hire agreement.[6] The Trusts also argue that PDE was bound by the CBAs due to its admitted status as an alter ego successor employer of signatory PDGP; and, alternatively, that PDE was bound by the substantive terms of the CBAs because PDE assumed PDGP's obligations under the CBAs. The Trusts do not dispute that PDE's Termination Notice was received by IBEW more than 150 days prior to the anniversary dates of the Inside Wireman's Agreement (May 31, 2018) and the Residential Construction Agreement (June 30, 2017), and that the agreements were therefore terminated on those respective anniversary dates.

### 2. The Trusts' Motion for Summary Judgment

The Trusts seek summary judgment on their two claims for relief—breach of contract and accounting—and also as to the various affirmative defenses raised by PDE.

The Trusts argue that they are entitled to summary judgment on their first claim that PDE breached the CBAs by failing to submit contribution reports and remit contributions as required by the CBAs. The Trusts contend that PDE remained bound by the CBAs until the CBAs' respective expiration dates, that the CBAs required PDE to submit reports and remit contributions, and that PDE failed to comply with those requirements.

The Trusts argue that they are also entitled to summary judgment on their second claim, which seeks an audit or accounting of PDE's records. The Trusts contend that the trust agreements as well as federal law permit the audit or accounting of PDE's records, and PDE is

---

[6] The Trusts also object to PDE's assertion of the one-employee-unit rule. The Trusts contend that PDE should be precluded from raising the one-employee-unit rule as a defense because PDE failed to disclose during discovery that it intended to rely on the one-employee-unit rule and failed/refused to disclose the facts and evidence it relies on in asserting the one-employee-unit rule. Finally, the Trusts contend that, even if PDE is allowed to raise the one-employee-unit rule as a defense, and the Court finds the rule applies to § 9(a) agreements, the rule is inapplicable here because PDE did not have a stable one-employee unit. As discussed below, the Court finds the one-employee-unit rule to be inapplicable. The Court therefore declines to address the Trusts's objection to PDE raising the rule as a defense and, further, does not reach the issue of whether PDE had a stable one-employee unit.

required to cooperate with the audit and pay any contributions ascertained by the audit and related charges for the periods during which the CBAs were in effect.

Finally, the Trusts request a court order establishing certain material facts. (ECF No. 34-2 at 22-24.)

As discussed in more detail above, PDE argues that it was entitled to terminate the CBAs under the one-employee-unit rule, that PDE was not bound by the CBAs under either the theory of alter ego or successor liability, and that PDE did not assume the obligations under the CBAs. PDE further argues that, should the court decline to grant summary judgment in its favor, there are at a minimum genuine issues of material fact that preclude granting summary judgment in favor of the Trusts.

## C. **Whether PDE Could Terminate the CBAs under the One-Employee-Unit Rule**

PDE contends that it was entitled to immediately terminate the CBAs under the "one-employee-unit rule." The Trusts respond that the one-employee-unit rule is inapplicable here because PDE did not employ its employees pursuant to a § 8(f) pre-hire agreement but, instead, employed the employees under a § 9(a) agreement.

### *1. Section 8(f) Pre-Hire Agreements versus Section 9(a) Agreements*

Section 8(f) of the National Labor Relations Act ("NLRA") authorizes a "pre-hire" collective bargaining agreement between an employer and a union.[7] "Unlike typical collective

---

[7] Section 8(f) provides:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title

29 U.S.C.A. § 158(f).

bargaining agreements formed under § 9(a), a 'pre-hire agreement is a contract agreed to by an employer and a union *before* the workers to be covered by the contract have been hired.'" *Baker Concrete Const., Inc. v. Reinforced Concrete Contractors Ass'n*, 820 F.3d 827, 832 (6th Cir. 2016) (quoting *Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 773 (3d Cir. 1988)). Pre-hire agreements set the terms and conditions of employment, and recognize the union as the exclusive bargaining representative, for workers who, upon employment, will be engaged in the construction industry. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 265-66 (1983); *Baker Concrete*, 820 F.3d at 832. Thus, although the general rule is that such an agreement would be illegal because it purports "to tie employees to a majority representative—i.e., labor union—without the majority of the employees selecting and ratifying which organization they wish to represent their interests," the construction industry has been granted an exception to this general rule. *Baker Concrete*, 820 F.3d at 832. The reason for this exception is the unique character of the construction industry:

> [B]ecause general contractors and other employers in the construction industry do not hire and keep employees and subcontractors on the same permanent basis as other employers do, it is necessary for these employers to have more flexibility in their bargaining contracts and union relations. Without the ability to enter into prehire agreements, contractors would be unable to submit informed and accurate bids for construction projects because they would not have any certainty regarding their employee expenses and personnel overhead. To accommodate these unique needs, Congress added § 8(f) to make prehire agreements legal within the construction industry.

*Id*. (citing *McNeff*, 461 U.S. at 267 ("[Absent] majority credentials . . . the collective-bargaining relationship and the union's entitlement to act as the exclusive bargaining agent had never matured." (alteration in original)). Thus, a § 8(f) agreement is between an employer in the construction industry and a union; employees are not involved in and do not have any control over the selection of the union as a representative.

In contrast, § 9(a) of the NLRA provides that representatives must have been designated or selected by a majority of the employees in a bargaining unit to "be the exclusive representatives of all the employees in such unit for purposes of collective bargaining. . . ."[8] Thus, a § 9(a) collective bargaining agreement can arise only after a

---

[8] Section 9(a) provides:

majority of the employees in a unit have voted in favor of the union acting as a representative for the employees.

Further, if the employer entered into a § 8(f) pre-hire agreement with a union, that agreement may mature into a binding § 9(a) agreement if a majority of the employees in the bargaining unit vote in favor of the union as their exclusive bargaining representative. *See N.L.R.B. v. Pac. Erectors, Inc.*, 718 F.2d 1459, 1463 (9th Cir. 1983) ("Once a union achieves majority status, 'the prehire agreement attains the status of a collective bargaining agreement executed by the employer with a union representing a majority of the employees in the unit.' Majority status thus converts a voidable 8(f) agreement into a binding section 9(a) exclusive representation agreement." (citations omitted)). The union then becomes certified as the employees' collective bargaining representative and has "the full panoply of Section 9 rights and obligations" that accompany that status. *John Deklewa & Sons*, 282 NLRB 1375, 1385 (1987).

Here, as previously noted, it is undisputed that the CBAs at issue are § 9(a) CBAs. The question the Court must answer is whether the one-employee-unit rule applies to these § 9(a) CBAs and, if so, whether the one-employee-unit rule can be invoked by PDE to repudiate the CBAs, and thus terminate PDE's obligations under the CBAs, prior to the date on which the CBAs expired.

### 2. *Applicability of One-Employee-Unit Rule to § 9(a) CBAs*

Under the one-employee-unit rule, "'a construction industry employer who employs a single employee pursuant to a Section 8(f) pre-hire agreement is entitled to repudiate the agreement by conduct sufficient to put the union and the employee on

---

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

29 U.S.C. § 159(a).

notice that the agreement has been terminated.'" *Laborers Health & Welfare Tr. Fund for N. California v. Westlake Dev.*, 53 F.3d 979, 982 (9th Cir. 1995) (quoting *Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 566 (9th Cir. 1984)); *see Haas Garage Door Co.*, 308 NLRB 1186, 1186-87 (1992) (holding that the one-man-unit rule applies in an 8(f) context, and that under the rule "when a unit consists of no more than a single permanent employee at all material times, an employee has no statutory duty to bargain and thus, will not be found in violation of the act for disavowing a bargaining agreement and refusing to bargain"); *Stack Electric, Inc.*, 290 NLRB 575, 577-78 (1988) (relying on one-employee-unit rule to hold that an employer who has entered into a § 8(f) pre-hire agreement does not have a statutory duty to bargain when the bargaining unit consists of no more than one employee). Thus, the Ninth Circuit has held that although, as a general rule, the "unilateral action of an employer will not render a CBA void and unenforceable, *in the unique circumstances of a section 8(f) pre-hire collective bargaining agreement*, an employer's unilateral repudiation of such agreement under the one-employee unit rule renders the agreement void, and the obligation to the ERISA benefit plan also ceases upon repudiation." *MacKillop v. Lowe's Mkt., Inc.*, 58 F.3d 1441, 1446 (9th Cir. 1995) (citing *Westlake Dev.*, 53 F.3d at 984) (emphasis added).

Here, were are not dealing with § 8(f) pre-hire agreements, but are instead dealing with § 9(a) CBAs. The Trusts argue that, as a result, the one-employee-unit rule is inapplicable and that PDE was accordingly not entitled to unilaterally repudiate the § 9(a) CBAs. PDE disagrees and argues that application of the one-employee-unit rule is not limited to § 8(f) pre-hire agreements, and that the rule "applies equally" to allow an employer to unilaterally repudiate a § 9(a) CBA.

Although the Ninth Circuit has not directly addressed the applicability of the one-employee-unit rule to § 9(a) CBAs, it has stated that the one-employee-unit rule allows an employer to unilaterally repudiate a CBA *in the unique circumstances* of a § 8(f) pre-hire agreement. *See MacKillop*, 58 F.3d at 1446 ("*Westlake* holds that, in the unique circumstances of a section 8(f) pre-hire collective bargaining agreement, an employer's

unilateral repudiation of such agreement under the one-employee unit rule renders the agreement void, and the obligation to the ERISA benefit plan also ceases upon repudiation." (citing *Westlake*, 53 F.3d at 982)); *see Westlake*, 53 F.3d at 982 (holding that employer lawfully repudiated a § 8(f) pre-hire agreement where audit of employer's records demonstrated that employer had a one-employee unit during the relevant time). That the one-employee-unit rule applies "in the unique circumstances of a section 8(f) pre-hire" agreement indicates that, conversely, the one-employee-unit rule does not apply to allow an employer to unilaterally repudiate obligations owed under a § 9(a) CBA. *See ibid*.

Decisions from other courts also support the conclusion that the one-employee-unit rule does not apply to allow an employer to unilaterally repudiate obligations owed under a § 9(a) CBA. In *Bd. of Trustees of Plumbers v. R. & T. Schneider Plumbing Co.*, 2015 WL 4191297 (S.D. Ohio 2015), the court rejected application of the one-employee-unit rule, holding that a § 8(f) pre-hire agreement is a pre-requisite to application of the rule. *Id.* at *12.[9] The court listed several reasons for finding the one-employee-unit rule to be inapplicable, two of which appear to be relevant to the present case.

First, the *Schneider* court noted that in cases applying the one-employee-unit rule, the employers "were construction companies that signed CBAs pursuant to the pre-hire provisions of section 8(f). . . ." *Id.* The court found that the Ninth Circuit's decision in *Westlake* "confirms that the existence of a section 8(f) pre-hire agreement is a prerequisite to the application of the one-employee unit rule." *Id.* (citing *Westlake*, 53 F.3d at 982).

Second, the *Schneider* court found that "the one-unit employee rule likely does not affect the enforceability of the CBA for purposes of ERISA." *Id.* The court noted that there is a distinction between barring a remedy under the NLRA and resolving a potential remedy under ERISA. *Id.* (citing *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing*

---

[9] In *Schneider*, as here, the employer raised the one-employee-unit rule as a defense to the plaintiffs' claim that the employer breached the CBA by failing to submit monthly reports and remit contributions. 2015 WL 4191297, at *10.

1  *Iron Workers, Local Union 1, AFL-CIO*, 398 F.3d 967, 977 (7th Cir. 2005), *as amended*

2  *on denial of reh'g and reh'g en banc* (Mar. 28, 2005); *Martin v. Garman Const. Co.*, 945

3  F.2d 1000 (7th Cir. 1991)). Thus, a finding that the one-employee-unit rule bars a

4  statutory remedy under the NLRA does not resolve whether there is a remedy available

5  under ERISA. *Ibid.* Specifically, the one-employee-unit rule "may remain valid for

6  purposes of unfair labor practice proceedings while counting for naught when the

7  contract is cognizable under ERISA." *Id.* (citing *Martin*, 945 F.2d at 1005). For this and

8  the other reasons discussed in the decision, the *Schneider* court found the one-employee-

9  unit rule to be inapplicable. *Id.* at *15; *see Local 377, RWDSU, UFCW v. 1864 Tenants*

10 *Ass'n*, 2007 WL 634751, at *11 (S.D.N.Y. 2007), *aff'd*, 533 F.3d 98 (2d Cir. 2008)

11 (rejecting application of the one-employee unit rule to a § 9(a) CBA and holding that the

12 § 9(a) CBA imposes binding contractual duties on the parties that may be enforced in a

13 suit under the LMRA, even if the employer's breach or repudiation of the CBA would not

14 constitute a violation of the statutory duty to bargain under § 8(a)(5)).

15      Despite this authority, PDE insists that the one-employee-unit rule allowed it to

16 unilaterally repudiate the § 9(a) CBAs at issue in the present case. PDE concedes that the

17 Ninth Circuit has not extended the rule beyond § 8(f) agreements. Instead, PDE cites to

18 two NLRB decisions from 1978 and 1983 and asks this Court to rely on those decisions

19 to extend the one-employee-unit rule to allow unilateral repudiation of the § 9(a) CBAs.[10]

20      The Court finds the NLRB decisions cited by PDE to be distinguishable from the

21 present case. Further, these decisions do not persuade the Court that the one-employee-

22 unit rule should be extended to relieve an employer of the obligations imposed by a § 9(a)

23 CBA.

24      The first NLRB decision cited by PDE is *Sac Constr. Co.*, 235 NLRB 1211

25 (1978). In *Sac*, the employer was a party to a § 9(a) CBA that had an expiration date of

26

27

28

---

[10] The Court grants deference to NLRB decisions adopting a rule that is rational and consistent with the NLRA. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987) ("If the Board adopts a rule that is rational and consistent with the Act . . . then the rule is entitled to deference from the courts."); *see UFCW, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002) ("The *Chevron* doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute.").

16

March 31, 1976. *Id.* at 1213. In April 1976, *after the CBA had expired*, the employer, who had employed only one employee in the relevant bargaining unit since July 1975, discontinued fringe benefit payments due under the § 9(a) CBA for that employee. *Id.* at 1218-19. The NLRB held that the employer did not violate the NLRA by discontinuing these payments:

> While the evidence *supra* establishes that [the employer] since about April 9, [1976,] unilaterally and without notice to or consulting with the Unions, has discontinued payments to the health and welfare, apprenticeship, and pension fringe benefit plans, the bargaining unit only consists of one employee. Moreover, it has employed only one employee in the unit since July 1975 and does not presently anticipate hiring any additional employees in the unit. The Board will not require an employer to bargain in a unit consisting of only one employee. *Stern Made Dress Co., Inc.*, 218 NLRB 372 (1975). Therefore, since at all times material herein [the employer] had a unit consisting of only one employee, I find that [the employer] did not violate Section 8(a)(1) and (5) of the Act by discontinuing payments to the health and welfare, apprenticeship, and pension fringe benefit plans as alleged.

*Id.* at 1220.

Thus, *Sac* holds that an employer with only one employee in the bargaining unit is not required to bargain or continue to make contributions required under a § 9(a) CBA *once that agreement has expired*. *See id.* The *Sac* decision does not address whether an employer with only one employee in the bargaining unit can unilaterally repudiate its obligations owed under a § 9(a) CBA prior to the date on which the CBA expires.

The second NLRB case cited by PDE is *Cardox Div. of Chemetron Corp*, 268 NLRB 335 (1983). In *Cardox*, the NLRB addressed whether the employer had a duty to bargain in a unit consisting of only one employee. Initially, two employees, which represented a majority of the employees, signed cards authorizing the union to represent them and the employer voluntarily executed an agreement recognizing the union. The union and employer had an initial negotiation session, but failed to reach an agreement and rescheduled another bargaining session for several months later. In the interim, before the next bargaining session and thus before any collective bargaining agreement had been reached, the two employees changed their minds and decided that they did not want the union to represent them, and one of the two employees began working at a location that was outside of the union's jurisdiction. Because only one employee remained in the

bargaining unit, the employer canceled the follow-up bargaining session and declined to resume

bargaining with the union. The union brought an action against the employer, claiming that the

employer violated the NLRA by withdrawing recognition from the union. The NLRB rejected the

union's claim, holding that because the unit was reduced to a one-employee unit prior to the

employer's withdrawal of recognition, and because the NLRB will not require an employer to

bargain when a unit consists of only one employee, the employer's withdrawal of recognition was

not unlawful. *Id.* at 336.

Thus, *Cardox* holds that an employer with only one employee in the bargaining unit is

relieved of its statutory duty to bargain with the union and may withdraw recognition from the

union where no collective bargaining agreement had been reached. The *Cardox* decision does not

address whether, once a binding § 9(a) CBA has been entered into by an employer, the employer

can unilaterally repudiate the CBA under the single-employee-unit rule.

Neither *Sac* nor *Cardox* persuade the Court that the one-employee-unit rule should be

extended to allow an employer to unilaterally repudiate the obligations owed under a § 9(a) CBA.

Based on the foregoing, the Court holds that the one-employee-unit rule does not extend

to § 9(a) CBAs to allow unilateral repudiation by the employer of obligations owed under the

CBAs. This holding is consistent with *MacKillop* and *Westlake*, in which the Ninth Circuit found

that the one-employee-unit rule applies in the unique circumstances of a § 8(f) agreement, and is

also consistent with cases from other courts holding that the one-employee-unit rule does not

allow unilateral repudiation of obligations owed under § 9(a) CBAs.

This holding also recognizes the critical distinction between statutory duties owed by an

employer under the NLRA (such as the duty to bargain) and an employer's contractual

obligations under a § 9(a) CBA. *See Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 2007

WL 634751, at *11 (S.D.N.Y. 2007) (recognizing "'critical distinction' between an employer's

statutory duty to bargain under § 8(a)(5) and an employer's contractual obligations under a

collective bargaining agreement"), *aff'd*, 533 F.3d 98 (2d Cir. 2008); *cf. McNeff*, 416 U.S. at 268

("There is a 'critical distinction' between an employer's obligation under the [NLRB] to bargain

with the representative of the majority of its employees and its duty to satisfy the contractual

obligations that accrued after it enters a prehire contract."); *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 135 S. Ct. 926, 933 (2015) ("We interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.); *Local Union 257, IBEW v. Sebastian Electric*, 121 F.3d 1180, 1185 (8th Cir. 1997) ("The fact that the employer may have had no statutory duty to bargain [because the union had not attained majority status] ... did not eliminate [the employer's] contractual obligations [under the pre-hire agreement]."). As stated in a labor and employment law treatise, "an employer is free to withdraw recognition from a union representing a bargaining unit that consists of a single employee.... However, although the employer will be relieved of its statutory bargaining obligation, its obligations under any collective bargaining agreement covering the remaining employee may continue." 1 N. Peter Lareau, Labor & Employment Law § 12.04(6) (Matthew Bender 2006).

Turning to the present case, assuming that the PDE bargaining unit had decreased to one employee—a fact that is in dispute—this decrease did not confer on PDE a right to unilaterally repudiate the § 9(a) CBAs and did not relieve PDE of its obligations under the CBAs. To the contrary, PDE remained bound by the substantive terms of the CBAs until the dates on which the CBAs expired.

### D.  Whether PDE is Bound by the CBAs as an Alter Ego Successor Employer

PDE argues, alternatively, that because it is not a signatory to the Letters of Assent (§ 8(f) pre-hire agreements) or the § 9(a) CBAs, but is instead the alter ego successor employer of the signatory (PDGP), it was not bound by and had the right to repudiate the Letters of Assent and CBAs; that it unambiguously repudiated the Letters of Assent and CBAs on June 1, 2016, through the Notice of Termination; and that, as a result, PDE has no liability under the CBAs after June 1, 2016. (ECF No. 33-1 at 17-20.)

Generally, an employer that takes over another business will not be bound by the substantive terms of CBAs entered into by the former employer. "At most, the [successor] employer will be required to bargain with any unions that the predecessor employer had recognized." *New England Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339, 1342 (9th

Cir. 1990). There are, however, two recognized exceptions to this rule. A successor employer will be bound to CBAs entered into by the predecessor employer if (1) the successor employer is the "alter ego" of the predecessor employer, or (2) the successor employer expresses an intent to be bound to the predecessor's CBAs. The Court finds that both of these exceptions apply here and, accordingly, that PDE is bound by the terms of the CBAs entered into by PDGP.

### 1. PDE is the alter ego successor of PDGP and is bound by the substantive terms of the CBAs.

#### a. PDE is the alter ego successor of PDGP

Under the "alter ego" doctrine, a non-signatory successor employer will be bound to the substantive terms of its predecessor's CBA if the successor employer is the "alter ego" of the predecessor employer. *New England Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339, 1343 (9th Cir. 1990) ("[A] successor employer will be bound to the substantive terms of a prior CBA if the successor employer is merely the alter ego of the predecessor employer.") (citing *Sheet Metal Workers Int'l Ass'n, Local No. 359, AFL-CIO v. Arizona Mech. & Stainless, Inc.*, 863 F.2d 647, 651 n.4 (9th Cir. 1988)). Thus, where the successor employer "is the 'alter ego' of the predecessor," and there is a "mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management," "the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 261 n.5 (1974) (citations omitted). In other words, if the successor employer is the alter ego of the predecessor employer, the successor employer is bound by the substantive terms of a CBA signed by the predecessor employer even though the successor employer did not sign or consent to the CBA. *See id.*

PDE has admitted on summary judgment that it is the alter ego successor employer to PDGP. (*See, e.g.,* ECF No. 33-1 at 12 ("PDE, the Alter Ego, Successor Employer to PDGP . . . ."); ECF No. 33-1 at 20 ("As such, there was an unambiguous repudiation by PDE, the alter ego successor to PDGP. PDE was lawfully entitled as alter ego successor to repudiate the

preexisting collective bargaining agreements of PDGP . . . .").)[11] PDE seeks to limit the scope of this admission by asserting that, in referring to itself as the "alter ego, successor," it

> is conceding only that at the time of PDE's formation it had substantially identical management, business purpose, operation, equipment, as well as ownership when compared to PDGP. PDE has not conceded, and there is no supporting evidence before the Court, that the union obligations of PDGP played any part in the formation or operations of PDE.

(ECF No. 36 at 17 n.9.) PDE contends that it cannot be bound to the obligations of the CBAs as the alter ego of PDGP because PDE was not formed for a wrongful purpose, such as to avoid union obligations.

The Court finds that the alter ego doctrine applies here despite the lack of wrongful motive behind the formation of PDE, and that, accordingly PDE is bound by the substantive terms of the CBAs.

Although the Ninth Circuit has not directly addressed whether wrongful motive is required for finding alter ego status,[12] other circuits have addressed the issue and have concluded that wrongful motive is relevant but is not a requirement for finding alter ego status. As the First Circuit explained:

> In *Howard Johnson . . .*, the Supreme Court said that wrongful motive is "frequently" present in the alter ego cases; it did not say "always." Similarly, we have said that "[n]o one factor [in the alter ego test] is controlling, and all need not be present to support a finding of 'alter ego status.'" After all, if a company merely changed its corporate form for legitimate tax or corporate reasons, it is hard to see why the new entity should be able to disregard an existing collective bargaining agreement or claim immunity when told to reinstate a worker wrongly

---

[11] PDE also made this admission in an answer to an interrogatory and has not sought to modify that answer. (*See* ECF No. 34-4 at 41 (PDE, stating in response to interrogatory, that "Responding Party was the alter ego, successor to signator Power Design Electric, a General Partnership . . . .").) Although there is disagreement as to the binding effect of interrogatories, *see, e.g., Victory Carriers Inc. v. Stockton Stevedoring Co.*, 388 F.2d 955, 959 (9th Cir. 1968) (holding that answers to interrogatories are not given the same binding effect conferred on responses to requests for admission), the Court notes that it is relying on PDE's statements in support of its motion for summary judgment and is not relying on PDE's interrogatory response in determining the alter ego issue.

[12] In *J.M. Tanaka Const., Inc. v. N.L.R.B.*, 675 F.2d 1029 (9th Cir. 1982), the Ninth Circuit set forth the test for determining whether the alter ego doctrine should be applied as follows: "In determining whether two businesses are alter egos, a court must consider the following factors: (1) centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control. No factor is controlling and all need not be present." *Id.* at 1033 (citations omitted). Thus, the Ninth Circuit did not include wrongful motive as an element in the alter ego test. However, in holding that the successor company was the alter ego of the predecessor company, the Ninth Circuit noted that the successor company "was created for the purpose of eliminating the high cost of dealing with the union," and was formed "to get away from a Union contract." *Id.* Thus, although the Ninth Circuit did not list motive as a factor in the alter ego test, it considered motive in determining that the successor was the alter ego of the predecessor. *See id.*

fired by the old one. This view—that a wrongful motive is not required—is shared by most other circuits.

*N.L.R.B. v. Hosp. San Rafael, Inc.*, 42 F.3d 45, 51 (1st Cir. 1994) (citations omitted). Other circuits have similarly held that wrongful motive is relevant, but is not required, for a finding of alter ego status. *See Goodman Piping Prod., Inc. v. N.L.R.B.*, 741 F.2d 10, 12 (2d Cir. 1984) ("The argument that the Board must find anti-union animus or an intent to evade union obligations before it can impose alter ego status is unpersuasive. The cases relied on by the appellant show that anti-union animus may be 'germane,' or even a sufficient basis for imposing alter ego status; they do not establish that anti-union motivation is necessary." (citations omitted)); *Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 319 (6th Cir. 2009) (The "evidence of an intent to evade, when it presents itself, is a relevant factor to be considered in determining whether the alter ego doctrine is applicable, along with "the well-established factors of substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership"—but it is not essential to the imposition of alter ego status." (citation omitted)); *N.L.R.B. v. Tricor Prod., Inc.*, 636 F.2d 266, 270 (10th Cir. 1980) ("[A] determination as to whether a second employer is a mere successor to a first employer, or is its alter ego, involves a consideration of numerous factors. There is no hard-and-fast rule. If an employer makes changes in its business operation to deliberately get rid of the union, the employer is more likely to be an alter ego. If, however, the employer has legitimate economic reasons for the changes, and is not motivated by anti-union sentiment, the second employer is more likely to be deemed a mere successor to the first. In connection with this particular aspect, we think evidence of anti-union sentiment by an employer, occurring either before or after the change in the structure of the business, is germane.").

The Court agrees with the reasoning in the foregoing cases and concludes, consistent with the circuit courts that have addressed the issue, that wrongful motive is a factor to be considered, but is not a prerequisite to finding that a successor employer is an alter ego to the predecessor employer.

Turning to the facts of the present case, PDE admits that, at the time it was formed, "it had

22

substantially identical management, business purpose, operation, equipment, as well as ownership when compared to PDGP." (ECF No. 36 at 17 n.9.) These admissions are sufficient to demonstrate that PDE is the alter ego of PDGP despite the lack of any evidence that PDE's formation was based on a wrongful motive, such as to avoid obligations under the CBAs. *See Hosp. San Rafael*, 42 F.3d at 51; *Goodman Piping Prod.*, 741 F.2d at 12; *Indus. Contracting, LLC*, 581 F.3d at 319; *Tricor Prod., Inc.*, 636 F.2d at 270; *cf. J.M. Tanaka Const., Inc. v. N.L.R.B.*, 675 F.2d 1029, 1033 (9th Cir. 1982) (listing test to determine whether two businesses are alter egos as considering "(1) centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control," but also discussing motive in determining that businesses were alter egos). The Court therefore finds that the undisputed facts establish that PDE is the alter ego successor employer to PDGP.

b. <u>PDE, as the alter ego successor employer, is bound by the substantive terms of the CBAs</u>

PDE argues that, even if it is the alter ego successor employer to PDGP, it was entitled to repudiate the CBAs as long as it did so unequivocally. In support of this argument, PDE cites to *Board of Trustees of the North West Ironworkers Health and Security Fund, et al. v. Tanksley*, 2010 WL 11270448 (E.D. Wash. 2010).

*Tanksley* holds that an alter ego successor employer becomes liable for ongoing obligations under a § 8(f) pre-hire agreement signed by the predecessor employer but "may repudiate [the] preexisting CBA through unambiguous action demonstrating an intent not to comply with the terms of the CBA." *Id.* (citing *Local 302, Int'l Union of Operating Engineers, AFL-CIO v. West*, 882 F.2d 399, 401 (9th Cir. 1989)).

PDE's reliance on *Tanksley* is misplaced. Not only is the case not controlling precedentially, but the *Tanksley* case, and the Ninth Circuit decision upon which *Tanksley* relies—*West*, 882 F2d at 400-01—involve § 8(f) pre-hire agreements. Neither *Tanksley* nor *West* address whether an alter ego successor employer can unilaterally repudiate a § 9(a) CBA.

This distinction between § 8(f) pre-hire agreements—which are not at issue in this case—and § 9(a) CBAs—which are at issue in this case—is critical. To the extent a § 8(f) pre-hire

23

agreement can still be unilaterally repudiated by an employer or by an alter ego successor employer,[13] "[o]nce a union achieves majority status in a stable work unit, the § 8(f) pre-hire agreement becomes a binding collective bargaining agreement under § 9(a) of the NLRA, and unilateral repudiation is generally prohibited by the contract bar rule." *Int'l Bhd. of Elec. Workers, AFL-CIO, Local Union No. 441 v. KBR Elec.*, 812 F.2d 495, 497-98 (9th Cir. 1987).[14] Thus, an employer cannot unilaterally repudiate a § 9(a) CBA. *See id; see also N.L.R.B. v. Triple C Maint., Inc.*, 219 F.3d 1147, 1152 (10th Cir. 2000) ("Under § 9(a) an employer may not unilaterally repudiate a contract and has a duty to bargain in good faith after the contract expires."); *Norbury Elec., LLC. v. Int'l Ass'n of Elec. Workers, Local Union No. 95*, No. 08-CV-5060-SW-DGK, 2010 WL 11509009, at *4 (W.D. Mo. Mar. 8, 2010) (same); *Trustees of the Sheet Metal Local No. 10 Control Bd. Tr. Fund v. Genz-Ryan Plumbing & Heating Co.*, No. CIV 08-4752 RHK/JJK, 2009 WL 2171001, at *4 (D. Minn. July 17, 2009) (same).

Although PDE seeks to distinguish the present case on the basis that PDE is not a signatory to the CBAs but is instead an alter ego successor employer, PDE has not cited, and the Court has not located, any case that allows an alter ego successor employer to unilaterally repudiate a § 9(a) CBA. This lack of authority makes sense because, as the alter ego successor employer of PDGP, PDE "is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." *Howard Johnson*, 417 U.S. at 261 n.5; *see New England Mech*, 909 F.2d at 1343 ("[A] successor employer will be bound to the substantive terms of a prior CBA if the successor employer is merely the alter ego of the predecessor employer."); *Arizona Mech. & Stainless, Inc.*, 863 F.2d at 651 ("[A] non-signatory employer may be held to the terms of a CBA signed by another employer under either the 'alter ego' doctrine or the 'single employer' doctrine.").

In sum, PDE, is the alter ego successor employer to PDGP, and is therefore bound by, and

---

[13] *See Mesa Verde Const. Co. v. N. California Dist. Council of Laborers*, 861 F.2d 1124, 1128 (9th Cir. 1988) (en banc) (adopting the then-new NLRB rule that a § 8(f) pre-hire agreement "may not be unilaterally repudiated by employers or unions").

[14] To the extent *KBR Elec.* holds that an employer can unilaterally repudiate a § 8(f) pre-hire agreement, that holding has been overruled by *Mesa Verde Const. Co.*, 861 F.2d at 1128 (adopting the then-new NLRB rule that a § 8(f) pre-hire agreement "may not be unilaterally repudiated by employers or unions").

1    did not have authority to unilaterally repudiate, the CBAs entered into by PDGP.

2            **2.   PDE also assumed obligations under, and is therefore bound by, the CBAs.**

3            The Trusts argue, alternatively, that even if PDE is not bound by the substantive terms of

4    the CBAs as the alter ego successor of PDGP, PDE adopted the CBAs and is therefore bound by

5    the substantive terms of the CBAs under the adoption rule. The Court agrees.

6            A successor employer that is not an alter ego may still be bound by the substantive terms

7    of its predecessor's CBA if it assumes or adopts those obligations. *Arizona Mech.*, 863 F.2d at

8    651. "An employer may indicate its intent to be bound to a previous employer's CBA by

9    explicitly agreeing to be bound or by acting in a way that is consistent with an intent to be

10   bound." *New England Mech.*, 909 F.2d at 1343-44 (citations omitted); *cf. West*, 882 F.2d at 401

11   ("It is settled circuit law that performance of obligations under a compliance agreement is

12   persuasive evidence that repudiation has not occurred.").

13           Here, there is no evidence that PDE explicitly agreed to be bound by the CBA. However,

14   the undisputed evidence demonstrates that PDE assumed the obligations under the CBAs and

15   acted consistently with an intention to be bound by the CBAs beginning in March 2005, and

16   continuing until June 1, 2016. Specifically, on March 16, 2005, only a few months after obtaining

17   its California contractor's license, PDE began complying with the requirements of the CBAs by

18   remitting contributions and submitting monthly payroll reports to IBEW. (*See* ECF No. 34-1 at

19   17-18; ECF No. 33-2 at 5.) There is no evidence that PDE sought to repudiate the CBAs or

20   disclaim the obligations imposed by the CBAs until more than eleven years later when, on June 1,

21   2016, PDE submitted the letter of termination to IBEW. However, even the letter of termination,

22   written by Robert Glover as president of PDE, demonstrates that PDE believed that it was bound

23   by the obligations imposed by the CBAs. That letter states:

24           Effective immediately Power Design Electric Inc. is terminating the agreements between
             the IBEW and Power Design Electric. It is my intention to work and rebuild my company
25           in hopes of once again having the ability to utilize union forces effectively and profitably.
             Over the last 5 years our relationship has not been profitable or effective in producing a
26           beneficial outcome to Power Design Electric Inc.

27   (ECF No. 33-4.)

28           In addition, PDE regularly executed certifications on monthly fringe benefit contribution

reports submitted to the trust funds associated with the CBAs. In these reports, PDE certified, "under penalty of perjury . . . that the information contained in this report is a full and accurate statement of hours worked and wages earned of all employees subject to employer contributions pursuant to a collective bargaining agreement with IBEW Local Union No. 100." (ECF No. 37-6 at 6-18.)

The undisputed evidence demonstrates that PDE assumed the obligations under the CBAs, and acted consistently with an intent to be bound by the CBAs, for a period of more than eleven years. PDE is, accordingly, bound by the substantive terms of the CBAs and did not have the right to unilaterally repudiate the CBAs.

## E. Effective Date of Termination of the CBAs

On June 1, 2016, the date on which PDE submitted its letter of termination, the operative Inside Wireman's Agreement was set to expire on May 31, 2018 (*see* ECF No. 33-4 at 33; ECF No. 34-1 at 12, 14); and the operative the Residential Construction Agreement was set to expire on June 30, 2016, but was extended for a period of one year with an expiration date of June 30, 2017 (*see* ECF No. 33-4 at 33, 79, 103; ECF No. 34-1 at 13, 14). (ECF No. 33-4 at 33, 79, 103). Both the Inside Wireman's Agreement and the Residential Construction Agreement provide that either party "desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter." (ECF No. 33-4 at 33, 79.) The parties agree that because the Termination Notice was provided more than 90 days prior to the expiration of the respective agreements, the notice terminated the Inside Wireman's Agreement effective May 31, 2018, and terminated the Residential Construction Agreement effective June 30, 2017. (*See* ECF No. 33-1 at 23 ("[A]ssuming, arguendo that the termination was not immediately effective, PDE's timely Termination Notice ended all of PDE's obligations under the agreements with IBEW and NECA on . . . May 31, 2018, and June 30, 2017, respectively. . . ."); ECF No. 34-2 at 20 (the Termination Notice left PDE "a signatory to the Inside Wireman's Agreement through May 31, 2018, and to the Residential Construction Agreement through June 30, 2017").

///

**F. Affirmative defenses raised by PDE**

The Trusts seek summary judgment on the third, sixth, seventh, eighth, ninth, eleventh, and fifteenth affirmative defenses raised by PDE.

### *1. PDE may properly seek summary judgment on affirmative defenses.*

PDE argues that the Court should construe the Trusts' motion for summary judgment on PDE's affirmative defenses as a motion to strike under Federal Rule of Civil Procedure 12(f) and deny the motion on that ground. (ECF No. 36 at 11-12.) The Court disagrees and finds that the Trusts may properly seek summary judgment on PDE's affirmative defenses

Federal Rule of Civil Procedure 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

Rule 56(a) was amended in 2010 to add the first sentence, and the Advisory Committee Notes on this amendment explain: "The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a), Adv. Committee Notes, 2010 Amendment.

The plain language of Rule 56(a) and the Advisory Committee notes make clear that seeking summary judgment on affirmative defenses is appropriate. Decisions from the Ninth Circuit also demonstrate that it is appropriate to seek summary judgment on affirmative defenses. *See, e.g., Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 589 (9th Cir. 2018)*, cert. denied sub nom. Teck Metals Ltd. v. Confederated Tribes of the Colville Reservation*, 139 S. Ct. 2693, 204 L. Ed. 2d 1091 (2019) ("To defeat this affirmative defense on summary judgment, the Colville Tribes and the State of Washington took on both the initial burden of production and the ultimate burden of persuasion."); *Bourbeau v. Cognitive Code Corp*., 693 F. App'x 499, 502 (9th Cir. 2017) ("[T]he district court did not err in granting summary judgment for Defendants on the issue of laches. As the district court correctly held, under California law, Defendants' affirmative

defense of undue influence is not barred by laches."); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) ("[W]e affirm the district court's grant of summary judgment for Defendants on their affirmative defense that Van Patten consented to receive the text messages at issue here."); *Factory Mut. Ins. Co. v. Nw. Aluminum Co.*, 99 F. App'x 103, 104 (9th Cir. 2004) (finding that defendant came forward with sufficient facts to preclude summary judgment on defendant's affirmative defense of equitable estoppel).[15] Accordingly, the Court finds that the Trusts may properly seek summary judgment on affirmative defenses raised by PDE.

### 2. *The Trusts are entitled to summary judgment on designated affirmative defenses.*

The Trusts seek summary judgment on the following affirmative defenses raised by PDE: third affirmative defense (the Trusts' breach of contract), sixth affirmative defense (estoppel), seventh affirmative defense (equitable estoppel), eighth affirmative defense (quasi estoppel), ninth affirmative defense (waiver), eleventh affirmative defense (unclean hands), fifteenth affirmative defense (set-off), and twenty-first affirmative defense (material failure of consideration). As to all but the twenty-first affirmative defense, PDE responded to interrogatories asking for the facts pertaining to these affirmative defenses as follows:

> Plaintiff repeatedly sent unqualified and/or problematic union members to Responding Party for employment. Plaintiff also attempted to assess Defendant with alleged contribution delinquencies subsequent to Defendant's termination of all agreements with Plaintiff. The aforementioned conduct of Plaintiff being in violation of the covenant of good faith and fair dealing implied in each of the agreements alleged by Plaintiffs, which imposed a continuing duty on Plaintiff to act in good faith in all transactions with Defendant . . . .

(ECF No. 34-4 at 24-27; ECF No. 36-1 at 8-9.)

As to the twenty-first affirmative defense (material failure of consideration), PDE responded to an interrogatory asking for the facts pertaining to this affirmative defense as follows:

> Plaintiff repeatedly sent unqualified and/or problematic union members to Responding Party for employment. The aforementioned conduct of Plaintiff being

---

[15] The cases PDE cites in support of its argument were decided prior to the 2010 amendment to Rule 56(a) and, moreover, are not controlling. (See ECF No. 36 at 11-12 (citing *Seacoast Liquor Distrib., Inc. v. Kips Bay Brewing Co.*, 8 F.R.D. 74, 75 (S.D.N.Y. 1947); *Krauss v. Keibler-Thompson Corp.*, 72 F.R.D. 615, 616 (D.C. Del. 1976); *Kerzman v. NCH Corp.*, 2007 WL 765202, at *10 (W.D. Wash. 2007).)

in violation of the covenant of good faith and fair dealing implied in each of the agreements alleged by Plaintiffs, which imposed a continuing duty on Plaintiff to act in good faith in all transactions with Defendant, all of which led to a material failure of consideration.

(ECF No. 34-4 at 27; ECF No. 36-1 at 9.)

The Trusts contend that these interrogatory responses demonstrate that PDE's affirmative defenses are based on the following contentions: (1) ) that PDE was allowed to immediately unilaterally terminate the CBAs and was no longer bound by the CBAs after June 1, 2016; and (2) that PDE properly and rightfully terminated, and is no longer bound by, the CBAs because the Trusts repeatedly sent PDE unqualified and/or problematic union members. The Trusts argue that because both of the contentions upon which the affirmative defenses rely are false, PDE's affirmative defenses fail as a matter of law and the Trusts are therefore entitled to summary judgment as to those affirmative defenses. (ECF No. 34-2 at 13.)

As discussed above, PDE did not have the right to unilaterally terminate the CBAs. Accordingly, to the extent PDE's affirmative defenses rely on PDE's contention that it had the right to unilaterally terminate the CBAs, those defenses fail.

PDE's affirmative defenses also fail to the extent those defenses rely on PDE's alternative contention that it could terminate the CBAs because the Trusts sent PDE unqualified and/or problematic union members.

Under ERISA § 515, "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. As the Ninth Circuit has explained, "section 515 mandates that employers are responsible for ERISA plan contributions regardless of defenses challenging the validity of the underlying CBA." *MacKillop v. Lowe's Mkt., Inc.*, 58 F.3d 1441, 1443 (9th Cir. 1995).

For reasons of public policy, traditional contract law does not apply with full force in actions brought under [ERISA] to collect delinquent trust fund contributions. In recognition of the fact that millions of workers depend upon employee benefit trust funds for their retirement security, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability

of contract defenses, which make collection actions unnecessarily cumbersome and costly.

*Id.* (quoting *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir. 1986)). Thus, for example, a defense of fraudulent inducement is "not available in ERISA trust fund collection actions against employers." *Id.* (citing *Southwest Admin.*, 791 F.2d at 773-75). Similarly, "an employer's assertion that the CBA is invalid due to lack of majority status is not a defense in an action brought by an ERISA plan or its trustees to collect employer contributions. Indeed, . . . Congress intended to abolish this very defense with the passage of section 515." *Id.* at 1444.

Here, PDE does not contend that the CBA is invalid. Instead, PDE contends that, as the "unconsenting successor employer," it is not bound by the substantive terms of the CBAs. The Court has already considered and rejected this argument, *supra*, and will not discuss it again here. As previously found, PDE is bound by the substantive terms of the CBAs.

Based on the foregoing, the Court finds that the Trusts are entitled to summary judgment on the designated affirmative defenses.

The Court now turns to whether the Trusts are entitled to summary judgment on their affirmative claims for relief.

### G. **Breach of Contract Claim**

In their first claim for relief, the Trusts allege that PDE breached the CBAs by failing to submit fringe benefit contribution reports and failing to remit the associated contributions. (ECF No. 2 at 4.)

The parties agree that, to prevail on this claim, the Trusts must demonstrate (1) that they are multiemployer plans, (2) that PDE is an employer obligated to pay contributions under the terms of the plans; and (3) that PDE failed to pay contributions in accordance with the plan. *See Trustees of Eighth Dist. Elec. Pension Fund v. Gietzen Elec., Inc.*, 898 F. Supp. 2d 1193, 1198 (D. Idaho 2012); ECF No. 34-2 at 20; ECF No. 36 at 19.

Here, the Trusts have provided evidence that the first element is met—that the Trusts are multiemployer plans—and PDE has not submitted evidence to show otherwise and further does

not deny that this element is met. Accordingly, the Court finds that the Trusts are multi-employer benefit plans governed by ERISA.

The dispute, here, comes down to the second and third elements. PDE contends that there are, at minimum, triable issues of material fact as to these elements and specifically as to whether PDE was bound by the CBAs as a successor employer or alter ego of PDGP, and whether PDE lawfully terminated the CBAs on June 1, 2016, under the one-employee-unit rule. (ECF No. 36 at 20-23.) The Court has already considered and rejected these arguments, *supra*. As previously found, PDE is bound by the substantive terms of the CBAs. These CBAs require the employer to pay fringe benefit contributions to the Trusts and provide that the employer is bound by the trust agreements. (*See, e.g.,* ECF No. 33-4 at 45, 63-69, 71, 86, 95-100.) Accordingly, PDE, as the alter ego successor to PDGP, was an employer obligated to pay contributions during the term of the CBAs—through May 2018 for the Inside Wireman's Agreement, and through June 2017 for the Residential Construction Agreement.

The Trusts have submitted evidence demonstrating that PDE has not submitted any contribution reports, nor remitted any contributions to the Trusts as required under the CBAs for the months of July 2016 through the date the CBAs terminated. (*See, e.g.,* ECF No. 33-4 at 45, 63-69, 71, 86, 95-100; 34-7 at 3; ECF No. 34-8 at 3-4; ECF No. 34-9 at 2.) PDE has not submitted any contradictory evidence on this point, and, further, PDE does not deny that it failed to submit contribution reports and failed to remit contributions from July 2016 forward. Accordingly, the Trusts are entitled to summary judgment on their breach of contract claim, and are entitled receive all contribution reports and all contributions owed under the CBAs.

## H. Accounting

In their second claim for relief, the Trusts seek an audit or accounting of the records of PDE, and that the Trusts be allowed to examine all reports and returns prepared by, or with respect to, PDE regarding the time worked by, and contributions remitted or not remitted for, PDE employees performing work covered by the CBAs. (ECF No. 2 at 5-6.) The Trusts also request that the Court establish certain material facts with respect to the accounting claim. The Trusts explain that the purpose behind the claim for an audit or accounting is to ensure that PDE

properly reported and remitted all contributions. In their motion for summary judgment, the Trusts seek (1) a judicial determination as to the audit or accounting right; (2) a determination of the period of time for which an audit or accounting can be conducted; and (3) an order compelling PDE to comply with the audit or accounting. The Trusts do not seek through their motion a determination as to the amount owed by PDE. (ECF No. 2 at 5-6; ECF No. 34-2 at 21 and n.5.)

As with the breach of contract claim, PDE contends that there are triable issues of material fact as to whether PDE was bound by the CBAs as an alter ego success or lawfully terminated the CBAs on June 1, 2016. (ECF No. 36 at 20-23.) The Court has already considered and rejected PDE's these arguments, *supra*. As previously found, PDE is bound by the substantive terms of the CBAs.

PDE does not dispute the Trusts' claim, and has therefore conceded, that if PDE is bound to the substantive terms of the CBAs and if the CBAs were not terminated by the June 1, 2016, Termination Notice, the Trusts are entitled to an audit or accounting for the period covered by the CBAs. Accordingly, the Court grants summary judgment to the Trusts on their claim for accounting, and finds that the period of time for which the Trusts may conduct an audit or accounting is through May 31, 2018. The Court further finds that PDE must comply and cooperate with that audit or accounting.

## I.  **Establishment of Certain Material Facts**

The Trusts also request that the Court issue an order under Federal Rule of Civil Procedure 56(g) establishing certain material facts as true. (ECF No. 34-2 at 22-24.) PDE opposes Plaintiffs' request, contending that the Trusts only offer "contentions disguised as material facts." (ECF No. 36 at 23-25.) In analyzing the various arguments raised by the parties, *supra*, the Court has already made the findings requested by Plaintiff, and the Court need not repeat those findings here.

## IV.  CONCLUSION

For the reasons discussed herein, IT IS ORDERED:

1. Plaintiffs' motion for summary judgment (ECF No. 34) is GRANTED;

2. Defendant's motion for summary judgment (ECF No. 33) is DENIED;

32

3. Defendant's motion to strike Plaintiffs' reply in support of Plaintiffs' motion for summary judgment (ECF No. 40) is DENIED;

4. Defendant's motion to strike Plaintiffs' reply regarding objections to Defendant's motion to strike (ECF No. 42) is DENIED;

5. Plaintiffs may conduct an audit or accounting of Defendant's records through May 31, 2018, and Defendants are directed to comply and cooperate with such audit or accounting; and

6. The Court sets this case for a status conference on **September 24, 2019, at 9:30 a.m.**, in Courtroom 10 (EPG) before Magistrate Judge Erica P. Grosjean. The parties are directed to file a joint status report one full week prior to the conference. The parties shall set forth in the status report any remaining issues to be resolved in this case and a proposed schedule for resolving those issues. The Court grants telephonic appearances, with each party wishing to so appear directed to use the following dial-in number and passcode: 1-888-251-2909; passcode 1024453.

IT IS SO ORDERED.

Dated: __September 10, 2019__          /s/ *Erica P. Grosjean*
                                              UNITED STATES MAGISTRATE JUDGE